Filed 11/22/23  P. v. Ramirez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GLEN ALLEN RAMIREZ,<br><br>    Defendant and Appellant. | H050583<br>(Santa Clara County<br>Super. Ct. No. CC120254) |

## I.  INTRODUCTION

In 2002, defendant Glen Allen Ramirez was convicted by jury of spousal rape by force (former Pen. Code, § 262, subd. (a)(1)),[1] forcible oral copulation (former § 288a, subd. (c)(2)), and infliction of corporal injury on a spouse (§ 273.5, subd. (a)).  Various allegations were also found true, including that he suffered a prior serious felony conviction (§ 667, subd. (a)).  Defendant was sentenced to an indeterminate term of 50 years to life consecutive to a determinate term of 30 years, which included a five-year enhancement for the prior serious felony conviction.

In 2020, the Secretary of the Department of Corrections and Rehabilitation (CDCR) recommended that defendant's sentence be recalled and that he be resentenced pursuant to then section 1170, subdivision (d).  The recommendation by the Secretary of

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

the CDCR was based on a change in the law that gives a trial court the discretion to strike a prior serious felony enhancement (see §§ 667, subd. (a)(1), 1385). After briefing by the parties and a hearing, the trial court declined to recall and resentence defendant.

On appeal, defendant contends that the trial court abused its discretion in declining to recall and resentence him because the court failed to make the requisite finding that he poses an unreasonable risk of committing a super strike offense. He also argues that there is no substantial evidence to support a conclusion that he poses an unreasonable risk of committing a super strike offense.

For reasons that we will explain, we will affirm the order denying recall and resentencing of defendant

## II. BACKGROUND

### A. *The Offenses*

The victim was defendant's estranged wife. The couple had been together for approximately five years and had been married for 14 months. During the course of their relationship, defendant was often physically abusive of the victim. The couple had frequently broken up over defendant's abuse and later reunited. At the time of the offenses, the couple was separated.

In August 2001, the victim arrived home to find defendant in her apartment. She told him to leave. Defendant grabbed the victim's wrists and pushed her into her bedroom and onto the bed, facing up. When the victim tried to free herself, defendant punched her hard underneath her right eye. The victim felt her face instantly swell up. Later, defendant attempted to stab the victim in the knee with a knife. He then grabbed her wrists, took her to the kitchen where he obtained a different knife that was seven or eight inches with a pointed tip, and took her back to the bedroom. Defendant ordered the victim to orally copulate him. She refused. When defendant attempted to force her to orally copulate him, she put her hand in front of her mouth. At that point, defendant put the knife to the victim's face and repeated his demand that she orally copulate him. The

2

victim complied. Defendant subsequently threatened to stab the victim if she did not remove her clothes. After the victim removed her clothes, defendant raped her and then stabbed her in the thigh. Defendant subsequently lifted the knife above his head and her face and told her that she was going to die. The victim cried and repeatedly told him not to do it. The victim had children from a previous marriage. She referred to her children, including saying their names. Defendant's face changed, and he brought his arm down.

B. *Verdicts and Sentencing*

In 2002, a jury convicted defendant of spousal rape by force (former § 262, subd. (a)(1)), forcible oral copulation (former § 288a, subd. (c)(2)), and infliction of corporal injury on a spouse (§ 273.5, subd. (a)). Various allegations were found true, including that defendant personally inflicted great bodily injury and/or personally used a dangerous or deadly weapon as to certain counts, that he suffered a prior serious felony conviction (§ 667, subd. (a)), and that he suffered a prior strike conviction.

According to the probation report, defendant had at least nine prior felony convictions and at least 34 prior misdemeanor convictions. His prior felony convictions included second degree burglary, escape by a misdemeanant, vehicle theft, and possession of a controlled substance. Defendant also had a prior strike conviction for a 1983 robbery in which he demanded money from a donut shop employee while pretending to have a weapon under his shirt. Defendant's misdemeanor convictions included two convictions for inflicting corporal injury on a spouse, four convictions for battery on a spouse, and convictions for violation of a domestic violence order, false imprisonment, vehicle theft, vandalism, and being under the influence of a controlled substance. Defendant was on probation at the time of the instant offenses.

Defendant was originally sentenced for the current offenses in 2002 to an indeterminate term of 80 years to life consecutive to a determinate term of 18 years. Following a successful appeal regarding a sentencing issue, defendant was resentenced in

3

2004 to an indeterminate term of 50 years to life consecutive to a determinate term of 30 years, which included a five-year enhancement for the prior serious felony conviction.

### C. *CDCR Recommendation for Recall of Sentence and Resentencing*

The Secretary of the CDCR sent a letter to the trial court dated January 9, 2020, stating that defendant had been sentenced in 2002[2] and that his sentence included a prior serious felony enhancement under section 667, subdivision (a)(1). The Secretary explained that the law had since changed to allow trial courts the discretion to strike a prior serious felony enhancement (see §§ 667, subd. (a)(1), 1385). The Secretary recommended that defendant's sentence be recalled and that he be resentenced in accordance with section 1170, former subdivision (d) (now section 1172.1). Various documents were attached to the letter, including documents reflecting defendant's participation in Alcoholics Anonymous and Narcotics Anonymous and his prison work assignments.

### D. *Trial Court's First Order Denying Recall and Resentencing*

In February 2020, the trial court declined to recall defendant's sentence. The court indicated that although a legislative change had given courts the discretion to strike the punishment for a serious felony enhancement, defendant's case had been final for many years by that time. The court stated that it was declining to use its authority to recall defendant's sentence "simply to avoid the lack of retroactivity" regarding the discretion to strike the punishment for the enhancement.

---

[2] The Secretary's letter indicated that defendant had been convicted in 2002 "for violating section(s) 273" (misdemeanor prohibiting the payment for consent to adoption of a child). Contrary to the Secretary's letter, defendant had not been convicted of violating this section but rather had been convicted of the three offenses that we have recited above.

**E. *Appeal Regarding First Order Denying Recall of Sentence***

Defendant appealed, and this court reversed the trial court's order. (*People v. Ramirez* (Sept. 7, 2021, H047929) [nonpub. opn.].) This court determined that "[a]lthough the impetus for the CDCR's recommendation under section 1170, subdivision (d)(1) was the possibility that an ameliorative change in the law could be applied to [defendant's] case, the letter reflected the CDCR's individualized recommendation, based on an assessment of multiple factors, that [defendant's] sentence should be recalled." (*Ibid.*) This court remanded the matter to the trial court to exercise its discretion under then section 1170, subdivision (d)(1) to recall and resentence defendant.

**F. *Briefing by the Parties After Remand***

After the matter was remanded to the trial court, defendant filed a memorandum of points and authorities in support of recall and resentencing. Defendant contended that although he had suffered a conviction for forced oral copulation, a sexually violent offense, the incident was remote in time and his "growth in prison and his deep awareness of his addiction issues, strongly indicate that he would pose no threat to anyone, were he to return to society." Defendant argued that the court should dismiss his prior strike conviction, his prior serious felony conviction, and the allegation that he personally committed great bodily injury.

Defendant also submitted documents in support of his request. The documents included a letter acknowledging the offenses against the victim and a separate letter of apology to the victim. He provided certificates reflecting his participation in Alcoholics Anonymous and Narcotics Anonymous. Defendant also completed a written relapse prevention plan. Other documents reflected his work in prison as a barber and a porter, as well as his attendance or participation in various programs such as victim awareness. Defendant provided documents showing that he had been disciplined in prison for incidents between 2004 and 2008, but that he had not received any serious discipline

since then.  Further, according to defendant, the documents showed that he was at the lowest security facility that was possible for a life prisoner serving a sentence for sexual assault-related crimes.

The prosecutor filed written opposition to the requests for resentencing and to dismiss the prior strike conviction.  The prosecutor also provided copies of the reporter's transcript of the victim's testimony from trial, the probation report that was prepared in connection with defendant's original sentencing, and the reporter's transcript of the original sentencing hearing.  The prosecutor recounted the facts of the 2001 incident leading to defendant's convictions for spousal rape by force, forcible oral copulation, and infliction of corporal injury on a spouse.  The prosecutor contended that defendant had a long history of domestic violence against the victim, including multiple convictions from 1995 through 1998 and 2001 for hitting, slapping, and punching her.  The prosecutor also referred to defendant's prior nine felony convictions, which included a prior strike conviction for a 1983 robbery, and numerous misdemeanor convictions.  Further, the prosecutor referred to defendant's rules violations reports for the various periods of time that defendant had been in prison, including for having an inmate manufactured weapon (1984 and 1985), attempted assault on another inmate (1985), force/violence on another inmate (2004), covering a cell window (2006), and fighting with an inmate (2008).  The prosecutor contended that defendant had not led a crime-free life since 1985 and his record now included four violent strikes.  The prosecutor argued that while defendant was to be "commend[ed] . . .  for his programming efforts" while in prison, there was no "justification" warranting recall and resentencing of defendant.

**G.** *The Hearing Regarding Recall and Resentencing*

The trial court held a hearing regarding the CDCR recommendation for recall and resentencing on October 4, 2022.

### 1. Defendant's Argument

Defendant's trial counsel argued that defendant should be resentenced because he was not a danger to society, his prior serious felony conviction should be stricken, and his motion to dismiss his prior strike should be granted. Defense counsel argued that defendant had "committed himself to changing his life" since his last rules violation in prison in 2008. Defendant was "clear of the drugs," had "done great work in terms of rehabilitating himself in that way," and he knew that he was "an addict for life." Defense counsel argued that there was "evidence of decreasing dangerousness" because defendant's prior strike conviction for the 1985 robbery was remote in time and the offenses in the instant case were from 2001, his "personal acknowledgement of the damage that he's done," and he would be addressing daily his "terrible addiction" which was "one of the main causes of that damage."

Defendant sought to make an "apology statement" to the victim, who was outside the courtroom but declined to be present for the statement. Defendant stated that he was "sorry for what happened to [the victim]"; expressed being "ashamed of [his] actions towards [her], the kids, and [her] parents"; and stated that he took "full responsibility" for what happened. Defendant stated that he had been working on his substance abuse and behavior issues through Narcotics Anonymous and that he had been involved in domestic violence and victim awareness courses or groups.

### 2. The Prosecutor's Argument

The prosecutor contended that the trial court should not recall defendant's sentence but, if it did, it should impose the same sentence, in view of the original probation report and sentencing in the case. The prosecutor argued that defendant had an "extended" history of domestic violence against the victim spanning five or six years which culminated in the violent 2001 incident. The prosecutor contended that the original sentencing judge "heard the entire jury trial" and there was no indication that that judge "would have granted [defendant] any bit of leniency for the crimes that he

7

committed especially considering the domestic violence history . . . and [defendant's] criminal history." The prosecutor argued that defendant went from committing multiple misdemeanor crimes to committing the strike offense for robbery in 1985, followed by four or five domestic violence convictions involving the victim in the 1990's, and then committing the instant three offenses which were "horrific crimes." The prosecutor contended that defendant "present[ed] an increasing level of seriousness and dangerousness in his criminal conduct."

The victim made an appearance in court and made the following statement:

"20 years ago when I was asked by the judge at the end of the hearing if I wanted to make a victim impact statement I declined as I had overwhelming fear and anxiety and I just wanted to leave the courtroom and put this all behind me. Today I have that same overwhelming fear and anxiety as I never thought that I would have to visit this part of my life again. However, this time I feel the need to share with you how fearful I am for my life and for the life of my family. And I ask the Court to please take into consideration my following statement when determining [defendant's] new sentence and why the Court should not consider reasons for an early release.

"During my relationship with [defendant] I endured severe physical, mental, and emotional abuse that still has an impact on my life today. Early on in my relationship with [defendant] he would tell me, 'God made you for me and me for you.' What seemed like a romantic notion at the time eventually became a very sinister premonition for my future with him. During our relationship I tried to leave several times and each time it resulted in him stalking me. He would call and follow me relentlessly. There were many times I'd be driving alone or with my children and all of a sudden I'd see him following me in his car and he would try to get me to pull over. He would wait until I was alone and would ambush me and try to convince me to reconcile our differences when I refused he would physically assault me and torture me . . . by twisting my wrists which has left me with pain and weakness in my wrists that persist to this day.

8

"Afterwards he would apologize and tried to treat the physical damage he caused me and I would foolishly take him back after feeling bad because I knew he cared for me. I didn't realize at the time that this vicious cycle was an abusive relationship. . . . [N]ow, I could tell you hours of stories about how [defendant] would randomly appear when I had left him, but I will only focus on a few to illustrate why I have a fear of [defendant's] release. Like the time I was staying at my parent's house after I had broke up with him the month before. One night he came to my parent's house late at night after he called me wanting to come over to talk. I had told him over the phone I was never going back to him and that my parents would have him arrested for trespassing if he came over, that didn't stop him. He came over, knocked on my window and started yelling when I told him to leave.

"I got scared he would wake up my parents so I told him to go to the front of the house. When I opened the front door, he grabbed me by the neck and dragged me around the corner to the next street over. He had a hammer in his waistband. . . . [M]y brother, who had lived with my mom at the time and noticed I was missing went looking for me. . . . He found me with [defendant] on the next street over and called the police which led to [defendant's] arrest.

"Several days later my brother and my father took my children to pick walnuts in the orchard across the street from my parent's house. It was then that they found [defendant's] jacket, cigarette buds, and the bubble gum he always chewed, lying on a pile on the ground behind a tree across from my parent's house. He had been watching their house. He always found a way to watch me.

"Another time my [other] ex-husband was bringing our son back from Karate one evening to my parent's house and saw [defendant] hiding under my father's vehicle in my parent's driveway. My [other] ex-husband called my parents and got out of his truck to confront [defendant], but [defendant] got up and ran off.

9

"And another time [defendant] had broken into my second[-]floor apartment . . . in San Jose . . . and hid inside until I got home.

"All of these incidents illustrate [defendant's] dangerous and unpredictable nature and this is just the stalking side, this doesn't even include the physical abuse that I endured throughout the relationship. I won't go into detail on all of that as it makes me sick to my stomach now.

"However, . . . if you've read through the various police reports that were filed over the years, you'll have some idea of what I've experienced, but even these only scratch the surface. Anyone who knows that domestic violence can be a precursor to homicide could have seen the warnings from all the reports filed over the years, which bring me to my final point.

". . . [N]ow I want to explain the main reason I don't think that [defendant] should be considered for an early release.

"[Defendant] was never one to let things go. [Defendant's] stalking was a symptom of a greater problem of obsession. In February 2010, eight years after [defendant] was incarcerated for this crime and a day or two from my daughter's 18th birthday, my daughter received a piece of mail at my [other] ex-husband's home with a return address of my parent's house in San Jose, which had been postmarked from San Francisco. When my [other] ex-husband saw the piece of mail, he was perplexed as my parents had sold that home and moved five years earlier to retire to another state and they would have sent any mail to her to my address where she lived. However, when he gave it to my daughter, she and I recognized [defendant's] handwriting. It was a birthday card for her[. I]t said that he was sorry for what he's done and that he would always love her. And it said, 'love, you know who.' It was unnerving and just confirmed that even eight years later, he was not over the situation.

"What is more alarming is that even after knowing he had a no contact order, he was able to get out a letter to her from prison via some, sort of, method. . . . [T]hat kind

10

of persistence is what scares me and should concern the Court.  [Defendant] would often tell me the only way this relationship will ever be over is in your death or mine.  That was not an exaggeration.

"He proved that on the night of the crime when he broke into my home[,] raped me, stabbed me, physically assaulted me, and told me I was going to die that night.  I can still remember the look in his face as he held a knife above my head on that night.  . . . [I]f I didn't cry, plead for my life and call out my daughter's name . . . over and over and tell him what this would do to her as I knew she was the one person in this world I felt he truly loved, I am certain I would not be here today.

"If the Court decides to release [defendant], I want them to remember that -- those words and his actions are the reason for my fear.  Please don't make me relive the fear of always having to look over my shoulder or the fear that he may harm my family.  I implore you.  I don't feel [defendant] is capable of letting the past go and releasing him puts me and my family in danger.  I am asking the Court to take this into consideration with its decision.  Thank you."

### 3.  The Trial Court's Ruling

The trial court indicated that it was taking a recess "to reflect on what ha[d] been presented" in the courtroom before announcing its decision regarding resentencing.  After the recess, the court stated that, "[h]aving considered the totality of the circumstances, including preconviction and postconviction factors," and having heard from defendant and the victim, the court was denying the recommendation and request to recall defendant's sentence and to resentence him in a "different way."  The court stated that the "original term continues to serve the interest of justice . . . for a variety of reasons including the following:

"The parties have been in clear agreement that the circumstances of the offenses for which [defendant] was convicted and for which he has been sentenced are extremely heinous, violent, terrifying, disturbing, and certainly of the nature of crimes for which the

11

original sentencing Court and this Court continues to believe that the [L]egislature intended the most significant consequences to be available to a sentencing Court to address public safety, punitive consequences, rehabilitative efforts in the interest of victims.

"In this particular case, the Court does believe that there is still an unjustifiable risk to public safety if [defendant] were to be resentenced or sentenced differently . . . in a way that would allow his earlier release from custody.

"[Defendant's] crimes, as they have been described in the Court files and also as they were described articulately and I'm sure with great difficulty by Ms. Doe today, are crimes that show the highest degree of domestic violence, the dynamic of power and control, controlling behavior and the type of the high degree of lethality that should cause any sentencing Court significant concern. These crimes were not isolated events, but reflected a pattern of conduct over a period of significant time in which [defendant] showed the highest degree of danger, placed Ms. Doe in legitimate and sustained fear. Fear that continues to this day, fear that, as she expressed continues to exist in her mind . . . if [defendant] were to potentially be released from custody upon resentencing.

"This Court believes that the evidence in the case supports Ms. Doe's opinion and assessment of her own circumstances with respect to her previous and continued relationship to [defendant] as her abuser and as the criminal offender who has changed her life for the negative as a result of his criminal behavior, which included not only sexual assault, but crimes of violence, the use of weapons that were committed while on probation, that were committed at a time when [defendant] . . . had already been subjected to efforts of substance abuse treatment, that were committed at a time when [defendant] already had a significant and substantial criminal history of both felony and misdemeanor conduct, including a serious felony or strike prior conviction in his criminal history.

"As far as postconviction conduct, [defendant] has made some efforts that have been presented towards substance abuse rehabilitation and other self-improvement efforts while incarcerated. He has suffered rules violations in the state prison. He has also been apparently free of rules violations for some number of years, but he has experienced both in his postconviction history while in the California Department of Corrections and Rehabilitation.

"With respect to his rehabilitative efforts, the Court believes that at this hearing the emphasis that has been put on substance abuse treatment and addiction services while positive are a far cry from addressing concerns of the root problem, and the root issues that caused [defendant] to be an extreme offender of sexual assault and domestic violence and continue to make him an unreasonable risk to public safety today.

"The issues related to stalking behavior[,] power and control dynamics, threats to kill in the colloquial, 'if I can [sic] have you no one will,' the threats to Ms. Doe[] as to how the relationship between the two of them would [someday] end, are still acute.

"[Defendant] still has the capability to carry those threats to conclusion, and the Court does not believe that his rehabilitative efforts with respect to Narcotics Anonymous and substance abuse treatment assuage any of the concerns that the Court would have in that regard.

"[Defendant] was not a young person when he committed these offenses, although he is an older person now. And the Court does not believe that there are any particular mitigating factors to be had with respect to his age at the time of the offenses.

"Also, while the Court appreciates [defendant's] showing of remorse and his statements in that regard today and does not necessarily find them to lack credibility, the Court also acknowledges that in 2002 at the time of original sentencing [defendant] was stating remorse at that time and just as today in considering whether it would be in the interest of justice . . . to strike any strike prior conviction allegations . . . and under the totality of the circumstances.

13

"This Court believes that under the totality of the circumstances no exercise of discretion in that regard would be within the interest of justice then or now based on all of the circumstances that exist in this case, the Court believes that even upon a presumption of recall of sentence and resentencing, that presumption is overcome by risk to public safety and for these reasons the Court is going to leave the sentence as previously imposed with no changes."

### III. DISCUSSION

On appeal, defendant contends that the trial court abused its discretion in declining to recall and resentence him because the court failed to make the requisite finding that he poses an unreasonable risk of committing a super strike offense. He also argues that there is not substantial evidence to support a conclusion that he poses an unreasonable risk of committing a super strike offense. Defendant requests that the trial court be directed to recall his sentence and conduct further proceedings.

The Attorney General contends that no abuse of discretion has been shown. The Attorney General argues that the trial court made the requisite findings and that substantial evidence supports the trial court's determination.

### A. *General Legal Principles Regarding Recall and Resentencing Under Section 1172.1*

Section 1172.1, subdivision (a) provides that a trial court "may, . . . at any time upon the recommendation of the secretary[,] . . . recall the sentence and commitment previously ordered and resentence the defendant in the same manner as if they had not previously been sentenced, whether or not the defendant is still in custody, and provided the new sentence, if any, is no greater than the initial sentence." This provision "authorizes the Secretary of the CDCR to recommend to the superior court that the court recall a previously imposed sentence and resentence the defendant. [Citations.] The CDCR recommendation furnishes the court with jurisdiction it would not otherwise have to recall and resentence and is 'an invitation to the court to exercise its equitable

14

jurisdiction.'  [Citation.]"  (*People v. McMurray* (2022) 76 Cal.App.5th 1035, 1040 [discussing former §§ 1170, subd. (d)(1) and 1170.03]; see *People v. Salgado* (2022) 82 Cal.App.5th 376, 378 & fn. 2 [explaining that recall and resentencing provisions of former § 1170, subd. (d)(1) were moved to new § 1170.03, which was later renumbered as § 1172.1].)

In recalling and resentencing the defendant, "the court may consider postconviction factors, including, but not limited to, the disciplinary record and record of rehabilitation of the defendant while incarcerated, evidence that reflects whether age, time served, and diminished physical condition, if any, have reduced the defendant's risk for future violence, and evidence that reflects that circumstances have changed since the original sentencing so that continued incarceration is no longer in the interest of justice." (§ 1172.1, subd. (a)(4).)  "The resentencing court may, in the interest of justice," "[r]educe a defendant's term of imprisonment by modifying the sentence." (*Id.*, subd. (a)(3)(A).)

Relevant here, section 1172.1 also provides that if the "resentencing request . . . is from the Secretary of the Department of Corrections and Rehabilitation," then "[t]here shall be *a presumption favoring recall and resentencing of the defendant, which may only be overcome if a court finds the defendant is an unreasonable risk of danger to public safety*, *as defined in subdivision (c) of Section 1170.18*." (*Id.*, subd. (b)(2), italics added.) Subdivision (c) of section 1170.18 in turn defines an unreasonable risk of danger to public safety as "*an unreasonable risk that the* [*defendant*] *will commit a new violent felony within the meaning of* [*section 667, subdivision (e)(2)(C)(iv)*]." (Italics added.) This "subdivision of section 667 identifies eight types of particularly serious or violent felonies, known colloquially as 'super strikes.' " (*People v. Valencia* (2017) 3 Cal.5th 347, 351, fn. omitted (*Valencia*).)  These super strikes include (1) "[a]ny homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive" and (2) a " 'sexually violent offense' as defined in subdivision (b) of

15

Section 6600 of the Welfare and Institutions Code."[3]  (§ 667, subd. (e)(2)(C)(iv)(I), (IV).)

A sexually violent offense is a statutorily specified sex crime, including rape (§ 261) and

oral copulation (former § 288a, now § 287), "when committed by force, violence, duress,

menace, fear of immediate and unlawful bodily injury on the victim or another person, or

threatening to retaliate in the future against the victim or any other person."  (Welf. &

Inst. Code, § 6600, subd. (b).)

In this case, the Secretary of the CDCR recommended recall and resentencing of

defendant to the trial court.  Consequently, the statutory presumption favoring recall and

resentencing applies (§ 1172.1, subd. (b)(2)), and the trial court must find "an

unreasonable risk that the [defendant] will commit a [super strike offense]" to overcome

the presumption.  (§ 1170.18, subd. (c); see *Valencia*, *supra*, 3 Cal.5th at p. 351.)  A trial

court's "generalized concern about [a defendant's] 'ability to continue to commit

crimes' " is not sufficient to overcome the presumption in favor of recall and

resentencing.  (*Nijmeddin v. Superior Court* (2023) 90 Cal.App.5th 77, 83 [analyzing

presumption for compassionate release under § 1172.2].)

---

[3] The complete list of the eight types of super strikes is as follows:  "(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.  [¶]  (II) Oral copulation with a child who is under 14 years of age and more than 10 years younger than the defendant as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than the defendant as defined by Section 286, or sexual penetration with another person who is under 14 years of age and more than 10 years younger than the defendant, as defined by Section 289.  [¶]  (III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288.  [¶]  (IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive.  [¶]  (V) Solicitation to commit murder as defined in Section 653f.  [¶]  (VI) Assault with a machinegun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245.  [¶]  (VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418.  [¶]  (VIII) Any serious or violent felony offense punishable in California by life imprisonment or death."  (§ 667, subd. (e)(2)(C)(iv)(I–VIII).)

"We apply the abuse of discretion standard of review to a trial court's denial of recall. [Citations.]" (*People v. E.M.* (2022) 85 Cal.App.5th 1075, 1082 (*E.M.*).) "[A]n abuse of discretion arises if the trial court based its decision . . . on an incorrect legal standard [citations]." (*People v. Knoller* (2007) 41 Cal.4th 139, 156 (*Knoller*).) Further, under the abuse of discretion standard, "a trial court's factual findings are reviewed for substantial evidence." (*In re White* (2020) 9 Cal.5th 455, 470 (*White*).)

### B. *Analysis*

Defendant contends that to overcome the statutory presumption in favor of recall and resentencing, the trial court had to make a finding that he posed an unreasonable risk of committing a super strike offense. He argues that the court did not make such a finding in this case, and therefore the court abused its discretion in declining to recall and resentence him. Defendant argues that the court simply "focused on what [he] could do rather than the probability that he would do those things" and that the court expressed only a generalized concern about his ability to continue to commit crimes without making any finding regarding the risk of him committing a super strike offense. (Italics omitted.) Defendant further contends that there is no substantial evidence to support a conclusion that he poses an unreasonable risk of committing a super strike offense.

We determine that the trial court made the requisite finding that "defendant is an unreasonable risk of danger to public safety" (§ 1172.1, subd. (b)(2)), meaning "an unreasonable risk that [he] will commit a [super strike offense]" (§ 1170.18, subd. (c); see *Valencia*, *supra*, 3 Cal.5th at p. 351).

First, the trial court expressly referred to the likelihood of the risk. The court stated that there was "still an unjustifiable risk to public safety if [defendant] were to be resentenced or sentenced differently" and that he continued to be "an unreasonable risk to public safety today." (See §§ 1172.1, subd. (b)(2), 1170.18, subd. (c).)

Second, the trial court made it clear that it was addressing the unreasonable risk of defendant committing super strike offenses, such as sexually violent offenses and murder.

17

(See §§ 1170.18, subd. (c), 667, subd. (e)(2)(C)(iv)(I), (IV).) In this regard, the court referred to the commitment offenses, which showed "the highest degree of domestic violence" and a "high degree of lethality" and which were part of "a pattern of conduct over a period of significant time in which [defendant] showed the highest degree of danger." The court likewise stated that defendant's offenses "included not only sexual assault, but crimes of violence, the use of weapons." The court explained that "the root issues that caused [defendant] to be an extreme offender of sexual assault and domestic violence . . . continue to make him an unreasonable risk to public safety today." The court further explained, "The issues related to stalking behavior[,] power and control dynamics, threats to kill in the colloquial, 'if I can [sic] have you no one will,' the threats to Ms. Doe[] as to how the relationship between the two of them would [someday] end, are still acute. [¶] [Defendant] still has the capability to carry those threats to conclusion . . . ." It is apparent from these statements that the court believed that not only was there an unreasonable risk of defendant committing another sexually violent offense, that is, a sex crime such as rape or oral copulation by force, violence, duress, menace, or fear (Welf. & Inst. Code, § 6600, subd. (b)), but that there was also an unreasonable risk that he would kill the victim.

Third, substantial evidence supports the trial court's finding that defendant posed an unreasonable risk of danger of committing a super strike offense, that is a forcible sex crime or murder. The record reflects that defendant engaged in domestic violence for years against the victim, culminating in forcible sex acts against her, stabbing her, and threatening to kill her. As the court explained, defendant's "substance abuse treatment and addiction services while positive are a far cry from addressing concerns of the root problem, and the root issues that caused [defendant] to be an extreme offender of sexual assault and domestic violence and continue to make him an unreasonable risk to public safety today. [¶] The issues related to stalking behavior[,] power and control dynamics, threats to kill in the colloquial, 'if I can [sic] have you no one will,' the threats to

18

Ms. Doe[] as to how the relationship between the two of them would [someday] end, are still acute."

We are not persuaded by defendant's contention that his current age (62 years old) and lack of recent prison rules violations indicate that he is no longer "an unreasonable risk of danger to public safety" (§ 1172.1, subd. (b)(2)). As the trial court observed about his convictions for spousal rape by force, forcible oral copulation, and infliction of corporal injury on a spouse, defendant, who was 40 years old at the time, "was not a young person when he committed these offenses, although he is an older person now." Defendant does not provide any persuasive argument, let alone evidence or authority, indicating that his current age makes him less likely to commit forcible sex crimes or murder against a female partner, particularly when, as explained by the trial court, the record does not reflect that defendant has addressed "the root problem, and the root issues that caused [him] to be an extreme offender of sexual assault and domestic violence."

Defendant similarly fails to persuasively articulate, let alone support with evidence or authority, how his apparently recent good behavior while confined in prison with other inmates equates with a lessened risk of him continuing to engage in violent sex crimes against, or the murder of, a female partner. As the trial court found, defendant had engaged in "a pattern of conduct over a period of significant time in which [he] showed the highest degree of danger" by engaging in "crimes that show the highest degree of domestic violence, the dynamic of power and control, . . . and the type of . . . high degree of lethality" against an intimate partner. The crimes "included not only sexual assault, but . . . violence, the use of weapons." As the court explained, defendant's "rehabilitative efforts" had not addressed the "the root issues that caused [him] to be an extreme offender of sexual assault and domestic violence and continue to make him an unreasonable risk to public safety today. [¶] The issues related to stalking behavior[,] power and control dynamics, threats to kill in the colloquial, 'if I can [sic] have you no one will,' the threats to Ms. Doe[] as to how the relationship between the two of them

19

would [someday] end, are still acute." His substance abuse treatment did not "assuage any of the concerns" about him "carry[ing] those threats to conclusion."

In sum, the trial court's statements clearly reflect that it found "defendant is an unreasonable risk of danger to public safety" (§ 1172.1, subd. (b)(2)), meaning "an unreasonable risk that [he] will commit a [super strike offense]" (§ 1170.18, subd. (c); see *Valencia*, *supra*, 3 Cal.5th at p. 351). Substantial evidence supports the court's finding. The court therefore did not abuse its discretion in concluding that the presumption in favor of recall and resentencing had been overcome and in declining to recall and resentence defendant. (§ 1172.1, subd. (b)(2); *E.M.*, *supra*, 85 Cal.App.5th at p. 1082; *Knoller*, *supra*, 41 Cal.4th at p. 156; *White*, *supra*, 9 Cal.5th at p. 470.)

## IV. DISPOSITION

The order denying recall and resentencing of defendant is affirmed.

_____
BAMATTRE-MANOUKIAN, J.



WE CONCUR:




_____
GREENWOOD, P.J.




_____
ADAMS, J.[*]




*People v. Ramirez*
**H050583**

_____

[*]Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.